IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Kevin Andre Martin, | ) | C/A No.: 1:16-3741-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Nancy A. Berryhill,[1] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Bruce Howe Hendricks, United States District Judge, dated December 16, 2016, referring this matter for disposition. [ECF No. 6]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 5].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this lawsuit.

I.    Relevant Background

A.    Procedural History

On December 6, 2012, Plaintiff protectively filed an application for SSI[2] in which he alleged his disability began on May 1, 2010. Tr. at 66 and 181–86. His application was denied initially and upon reconsideration. Tr. at 79–83 and 87–91. On July 31, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Arthur L. Conover. Tr. at 25–51 (Hr'g Tr.).[3] The ALJ issued an unfavorable decision on August 12, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–24. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 28, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 32 years old at the time of the hearing. Tr. at 29. He completed the eleventh grade. Tr. at 31. He has no past relevant work ("PRW").[4] Tr. at 47. He alleges he has been unable to work since May 1, 2010. Tr. at 181.

---

[2] Plaintiff filed an application for Disability Insurance Benefits ("DIB") (Tr. at 187–93), but his application was denied because he did not work long enough to qualify for benefits. Tr. at 75–78. It does not appear that Plaintiff appealed the DIB decision.

[3] Plaintiff initially presented for a hearing on March 2, 2015. Tr. at 57. The hearing was continued to allow Plaintiff to be examined by an orthopedist. Tr. at 57–58. The ALJ postponed a second hearing on June 19, 2015, because he had not yet received a report from a consultative examination. Tr. at 54–55.

[4] Plaintiff indicated in a work history report that he worked full-time as a laborer for a moving company from June 1997 through April 2010. Tr. at 225–26. He informed a

## 2. Medical History

Plaintiff presented to the emergency room ("ER") at Palmetto Health Baptist on April 13, 2010, after sustaining an on-the-job injury to his knee. Tr. at 267. Stephen F. Ridley, M.D. ("Dr. Ridley"), observed swelling in Plaintiff's right knee. *Id.* He stated Plaintiff's medial and collateral ligaments appeared to be intact. *Id.* He indicated he was unable to perform anterior drawer testing on Plaintiff's acromioclavicular ligament ("ACL"). *Id.* An x-ray of Plaintiff's right knee revealed an effusion, but no fracture. *Id.* Dr. Ridley diagnosed a knee sprain, placed Plaintiff in a knee immobilizer, and instructed him to follow up with an orthopedist. *Id.*

On May 10, 2010, Plaintiff complained of sharp, constant, non-radiating right knee pain and swelling. Tr. at 322. Robert M. DaSilva, M.D. ("Dr. DaSilva"), observed Plaintiff to be ambulating with an antalgic gait and using an assistive device. Tr. at 323. He noted effusion in Plaintiff's right knee and positive Lachman's test. *Id.* He assessed a probable right knee ACL tear and referred Plaintiff for magnetic resonance imaging ("MRI"). *Id.* He indicated Plaintiff should remain out of work until after the MRI. Tr. at 324.

---

consultative examiner that he had worked for Atlas Van Lines since he was 17- or 18-years old. Tr. at 438. A second physician noted that Plaintiff "was employed by United Van Lines for approximately 13 years prior to the injury." Tr. at 432. Plaintiff testified that he was injured while working as a mover for Atlas Van Lines. Tr. at 34. He stated his father was a contractor for the company and hired him to assist with jobs. Tr. at 46–47. Although Plaintiff's certified earnings record reflects no substantial gainful activity (Tr. at 209–10) and his detailed earnings query (Tr. at 212–13) fails to show that he was employed by Atlas Van Lines, the evidence suggests that Plaintiff worked for the company for a substantial period.

On June 9, 2010, an MRI of Plaintiff's right knee showed an ACL tear; a complex large displaced bucket-handle tear of the posterior horn of the medial meniscus; a complex tear of the posterior horn of the lateral meniscus; a cartilage defect with narrow edema in the lateral femoral condyle; and an osteochondral contusion of the lateral tibial plateau. Tr. at 345.

Plaintiff followed up with Dr. DaSilva on June 24, 2010. Tr. at 325. He rated his pain as a six on a 10-point scale and described it as intermittent and sharp. *Id.* Dr. DaSilva observed that Plaintiff had an antalgic gait and was using assistive devices. Tr. at 326. He noted effusion in Plaintiff's right knee and positive Lachman's test. *Id.* He stated the MRI results were consistent with tears to the right ACL and medial meniscus. *Id.* He scheduled Plaintiff for arthroscopic-assisted ACL repair and indicated he should remain out of work until after surgery. Tr. at 326 and 327.

Dr. DaSilva performed an arthroscopic partial medial meniscectomy to Plaintiff's right knee on July 21, 2010. Tr. at 329–30. Plaintiff followed up for a post-operative visit on July 27, 2010. Tr. at 331. Dr. DaSilva observed Plaintiff's wounds to be clean, dry, and intact. *Id.* He changed Plaintiff's dressings, instructed him on use of a knee brace, and directed him to report immediately to physical therapy. *Id.*

On August 10, 2010, Plaintiff informed Dr. DaSilva that he had not yet reported for physical therapy. Tr. at 333. Dr. DaSilva removed Plaintiff's sutures and observed his wounds to be clean, dry, and intact. *Id.* He stated "[p]atient was told to go to therapy during last visit. He was told today to go directly to therapy. He was aware and is aware of the complications that can occur for not going to therapy." *Id.* He assessed Plaintiff as

"[n]oncompliant." *Id.* He instructed him to resume normal bathing activities; to wean off crutches; to report for physical therapy; and to follow up in three weeks. *Id.*

Plaintiff presented to Human Performance & Rehab for an initial physical therapy evaluation on August 30, 2010. Tr. at 320. He rated his right knee pain as a four on a 10-point scale. *Id.* Joshua Whitney, PT ("Mr. Whitney"), indicated he planned to see Plaintiff twice a week for six weeks. Tr. at 321. However, Mr. Whitney discharged Plaintiff on September 28, 2010, for failure to attend five of the 12 authorized visits. Tr. at 310.

On October 14, 2010, Dr. DaSilva observed Plaintiff to have full range of motion ("ROM") of his right knee, negative Lachman's test, negative shift, and well-healed surgical scars. Tr. at 334. He released Plaintiff to perform sedentary work duties. Tr. at 335.

Dr. DaSilva referred Plaintiff to physical therapy again on October 20, 2010. Tr. at 336. A note from Human Performance & Rehab dated December 3, 2010, indicates Plaintiff attended 13 physical therapy visits and missed or cancelled seven visits. Tr. at 294–95. At the time of discharge, Plaintiff's right knee flexion was reduced by 20 degrees; had 4+/5 strength in his right quadriceps and hamstrings; and right quadriceps muscles showed some atrophy, but were improving. Tr. at 294.

On December 16, 2010, Plaintiff rated his pain as a six on a 10-point scale and described it as intermittent and sharp. Tr. at 337. Dr. DaSilva observed Plaintiff to have negative Lachman's and anterior drawer tests; full ROM; no swelling; no effusion; and no evidence of infection in his right knee. Tr. at 338. He released Plaintiff with a nine

5

percent impairment rating to his right lower extremity. *Id.* He indicated Plaintiff could return to regular work duty without restrictions. Tr. at 339. On December 17, 2010, Dr. DaSilva wrote Plaintiff that he could provide no further treatment options and recommended that he seek care from another physician as soon as possible. Tr. at 341. He stated he was willing to provide emergency care for 30 days to allow Plaintiff time to select another physician. *Id.*

Plaintiff presented to David A. Scott, M.D. ("Dr. Scott"), for evaluation of his right knee on August 10, 2011. Tr. at 426. He reported severe pain in his right knee, but denied having experienced numbness, tingling, or weakness. *Id.* Plaintiff complained of pain with flexion past 90 degrees and hyperextension. *Id.* Dr. Scott indicated Plaintiff had "too much guarding" for him "to accurately assess his ACL." *Id.* He noted no pain in the popliteal crease or gastroc muscle complex; no pain in the medial or lateral joint line; and no signs of erythema, edema, infection, or effusion. *Id.* He referred Plaintiff for an MRI of his right knee. *Id.*

On August 22, 2011, an MRI of Plaintiff's right knee showed satisfactory postoperative changes with normal appearance of the ACL graft and no evidence of graft impingement or tear; an oblique radial tear of the junction of the posterior and medial horns of the medial meniscus; and mild chondral degeneration of the posterior lateral femoral condyle with focal reactive subchondral sclerosis and marrow edema. Tr. at 425.

Plaintiff followed up with Dr. Scott on August 24, 2011. Tr. at 420. He reported that he worked as a mover. *Id.* He complained that his right knee occasionally buckled and that he experienced pain with weight bearing and ambulation. *Id.* Dr. Scott observed

Plaintiff to have no signs of erythema, edema, infection, or effusion and no pain with hyperextension or deep flexion. *Id.* He noted that Plaintiff had reported pain on the McMurray test and had a soft ACL endpoint. *Id.* He stated the MRI showed evidence of a medial meniscal tear. *Id.* He referred Plaintiff to Frank K. Noojin, III, M.D. ("Dr. Noojin"). *Id.*

Plaintiff presented to Dr. Noojin for a second opinion on August 31, 2011. Tr. at 418. He indicated he had returned to work in December 2010, but had stopped working after he developed pain in the lateral aspect of his right knee. *Id.* Dr. Noojin observed Plaintiff to have antalgic gait; a normal sensory examination; no effusion in either knee; stable Lachman's test; negative posterior drawer and medial and collateral ligament stress tests; no tenderness in the patellar tendon or quadriceps tendon; negative pivot shift test; posterior popliteal discomfort; ROM to 140 degrees bilaterally; no medial joint line tenderness. *Id.* He noted Plaintiff was unable to squat. *Id.* His impressions were patellofemoral pain syndrome, status post-ACL reconstruction and possible right knee medial meniscus tear. *Id.* He offered Plaintiff a cortisone injection and referred him to physical therapy. Tr. at 419. Dr. Noojin administered a Depo-Medrol injection to Plaintiff's right knee on September 7, 2011. Tr. at 417.

On October 26, 2011, Dr. Noojin observed Plaintiff to have no effusion; positive patellar apprehension; mild medial and lateral joint line tenderness; and a guarded gait. Tr. at 416. He noted that Plaintiff was unable to squat. *Id.* He indicated additional arthroscopic surgery was unlikely to provide significant relief. *Id.* He recommended Plaintiff engage in another month of physical therapy. *Id.*

Plaintiff returned to Dr. Noojin on November 30, 2011, after having completed 13 physical therapy visits. Tr. at 414. Dr. Noojin observed Plaintiff to have stable Lachman's test, no effusion, ROM to 130 degrees bilaterally, and apprehensive joint lines and patella. *Id.* He recommended additional physical therapy. *Id.*

On January 11, 2012, Plaintiff reported that his pain had been exacerbated by physical therapy. Tr. at 411. Dr. Noojin observed Plaintiff to have "a little bit of medial sided tenderness"; a slightly-inflamed saphenous nerve; prepatellar mobility with slight apprehension; nontender joint lines; and a stable knee. *Id.* He indicated he generally agreed with Dr. DaSilva that "there is not much else that can be done." *Id.* He referred Plaintiff for a functional capacity evaluation ("FCE"). *Id.*

Plaintiff presented to Jim Cates, PT, SCS ("Mr. Cates"), for an FCE on January 31, 2012. Tr. at 346–47. Test results suggested Plaintiff was capable of meeting the physical demands of light work. Tr. at 346. Mr. Cates noted that Plaintiff put forth consistent effort and attempted all non-material handling activities. Tr. at 347. He stated Plaintiff could tolerate bending, rotation, and reaching, but could not tolerate kneeling or squatting. *Id.* He indicated Plaintiff had limited active ROM of his right knee. *Id.*

Plaintiff rated his right knee pain as an eight on a 10-point scale on February 22, 2012. Tr. at 410. Dr. Noojin observed him to have no effusion; stable Lachman's test; ROM to 120 degrees bilaterally; apprehensive patella; and tightness of the lateral retinaculum on the right. *Id.* He stated Plaintiff was unable to squat. *Id.* He noted that Plaintiff had put forth good effort during the FCE and would only qualify for light duty

work. *Id.* He decided to proceed with arthroscopic debridement and lateral release of the patella to reduce Plaintiff's pain and allow him to return to work. *Id.*

On March 30, 2012, Dr. Noojin performed a right knee arthroscopy with arthroscopic lateral release and partial lateral meniscectomy. Tr. at 405. He used intraoperative foot pumps and Thrombo-Embolic Deterrent ("TED") hose and instructed Plaintiff to take aspirin to prevent deep venous thrombosis ("DVT"). *Id.*

On April 4, 2012, Dr. Noojin observed Plaintiff to have some mild effusion, but no calf or thigh tenderness. Tr. at 403. He noted that Plaintiff was able to extend his right knee and flex to 30 degrees. *Id.* He removed Plaintiff's sutures and indicated his portals were healing well. *Id.* He referred Plaintiff to physical therapy and prescribed Percocet. *Id.* He noted that Plaintiff had not been taking aspirin, but counseled him to take it daily for two weeks. *Id.*

Plaintiff reported little improvement on May 2, 2012. Tr. at 402. Dr. Noojin observed Plaintiff to have 1+ effusion in his right knee, but noted the portals were healing well and that he had no signs of complications or infection. *Id.* He stated Plaintiff had nearly full extension and was able to flex his right knee to 100 degrees. *Id.* He instructed Plaintiff to continue physical therapy and prescribed Percocet. *Id.*

On July 25, 2012, Dr. Noojin observed Plaintiff to have no effusion; ROM to 130 degrees; an apprehensive patella with "very good mobility"; stable Lachman's test; and a slightly-guarded gait. Tr. at 399. He referred Plaintiff for four to six more weeks of aquatic therapy. *Id.* He indicated Plaintiff would probably need occasional anti-inflammatory medications and brace wear every one to two years for the knee. *Id.* He

stated Plaintiff was at maximum medical improvement; would be limited as indicated in the FCE; and would not require additional surgery. *Id.* He assessed impairment ratings of three percent for ACL reconstruction and scar tissue and four percent for "persistent patellofemoral pain and maltracking," for a total right lower extremity impairment rating of seven percent. Tr. at 400.

Plaintiff presented to William L. Lehman, Jr., M.D. ("Dr. Lehman"), for an independent medical examination on September 18, 2012. Tr. at 432. Dr. Lehman observed Plaintiff to have reduced right knee ROM from 10 to 85 degrees; 1+ to 2+ Lachman's test; normal anterior drawer test; obscure sensory changes and a definite area of hypersensitivity about the medial peripatellar area consistent with neuroma formation; no effusion; 1+ laxity to posterior drawer; no apprehension or patellofemoral grinding; and definite antalgic limp. Tr. at 435. He assessed persistent right knee and leg pain. *Id.* He noted that Plaintiff continued to have objective deficits that included limited active motion and atrophy of the quadriceps, despite having engaged in limited physical therapy. *Id.* He recommended additional physical therapy and stated electrical studies and referral to a neurologist should be considered. *Id.* He noted that Plaintiff had at least a two-centimeter loss of thigh girth on the right, as opposed to the left. Tr. at 436. He indicated the "primary disabling factors" related to "the diffuse hypersensitivity and dysesthesias around the knee and leg" and "loss of motion and weakness of the right knee." *Id.* Dr. Lehman assessed a 20 percent impairment rating to Plaintiff's right lower extremity. *Id.*

Plaintiff presented to Thomas J. Motycka, M.D. ("Dr. Motycka"), for a comprehensive orthopedic examination on May 29, 2013. Tr. at 437. He indicated he continued to work for Atlas Van Lines. Tr. at 438. Dr. Motycka observed that Plaintiff "had been actively moving his right knee smoothly as he transitioned through the various positions needed for examination, however, during focused exam, he resisted with great strength, but eventually relented and it had normal range of motion and there was no crepitus and no effusions, and was essentially symmetric with the left." *Id.* He noted Plaintiff had no effusion, redness, warmth, crepitus, instability, McMurray clicks, or Baker's cyst. Tr. at 439. He indicated the entire orthopedic examination was normal. *Id.* He stated Plaintiff had no atrophy and his right knee function remained intact. *Id.* He indicated Plaintiff's discomfort "cause[d] him not [to] achieve the quality of jumping, or basketball playing, that he did in the past." *Id.*

On May 31, 2013, state agency medical consultant Ellen Humphries, M.D. ("Dr. Humphries"), reviewed the evidence and found that Plaintiff's impairments were non-severe. Tr. at 63. A second state agency medical consultant, Hurley W. Knott, M.D. ("Dr. Knott"), reached the same conclusion on August 5, 2013. Tr. at 71.

Plaintiff presented to the ER at Providence Hospital on December 5, 2013, with complaints of pain in his head and a burning feeling in his right foot. Tr. at 443. He reported that during the prior week, he had been hit in the head with a board and lost consciousness for approximately one minute. *Id.* He indicated that swelling in his left eye and face had gone down, but that he continued to experience sensitivity and a shooting pain above his left eye. *Id.* The attending physician observed no abnormalities on

physical examination. Tr. at 445–46. He stated Plaintiff had no obvious defects or neurological deficits and indicated his pain was likely caused by some swelling that was pressing on the nerves. Tr. at 446. He prescribed Prednisone, Indocin, and Tramadol. *Id.*

Plaintiff presented to Damon Daniels, M.D. ("Dr. Daniels"), for a consultative examination on June 17, 2015. Tr. at 449. Dr. Daniels observed increased muscle spasm and rigidity with ROM testing in Plaintiff's right lower extremity. Tr. at 450. He noted Plaintiff's right calf was one centimeter smaller in circumference than his left and his right thigh was a half centimeter smaller than his left. *Id.* He indicated Plaintiff's lumbar flexion was reduced by 20 degrees and his lumbar extension and lateral flexion were reduced by 10 degrees. Tr. at 451. He stated Plaintiff's right knee ROM was reduced by 30 degrees. *Id.* He noted Plaintiff's right hip ROM was reduced by 20 degrees with abduction, 10 degrees with adduction, 20 degrees with flexion, 10 degrees with internal rotation, 20 degrees with external rotation, and 10 degrees with extension. *Id.* He indicated Plaintiff "was completely unable to squat." *Id.* He stated Plaintiff was "very unsteady with the tandem walk, heel walk, and the toe walk." *Id.* He noted Plaintiff demonstrated 3/5 strength in the proximal and distal muscle groups of his right lower extremity. *Id.* He stated Plaintiff demonstrated decreased sensation to pinprick and light touch from his right knee to the dorsum of his right foot. *Id.* He indicated Plaintiff had 1+ patellar reflexes in his right leg. *Id.* Dr. Daniels assessed chronic right knee pain, chronic low back pain, and right lower extremity atrophy. Tr. at 452. He stated Plaintiff had "definite atrophy of the right lower extremity, which is consistent with significant nonuse

of that extremity compared to the left." *Id.* He indicated this would affect Plaintiff's "ability for prolonged standing, walking, climbing, and squatting." *Id.*

Dr. Daniels also completed a medical source statement. Tr. at 455–60. He indicated Plaintiff could lift up to 10 pounds continuously; 11 to 20 pounds frequently; and 21 to 50 pound occasionally. Tr. at 455. He estimated Plaintiff could carry up to 10 pounds continually and 11 to 50 pounds occasionally. *Id.* He indicated Plaintiff could never lift or carry over 50 pounds. *Id.* Dr. Daniels explained that his opinion was based on his observations of 3/5 strength in Plaintiff's right leg and atrophy of his calf muscle. *Id.* He stated Plaintiff could sit for four hours, stand for one hour, and walk for 30 minutes without interruption. Tr. at 456. He estimated Plaintiff could sit for four hours, stand for two hours, and walk for two hours in an eight-hour workday. *Id.* He indicated Plaintiff did not require the use of a cane to ambulate. *Id.* He stated Plaintiff was capable of reaching, handling, fingering, feeling, and pushing/pulling continuously with his bilateral hands. Tr. at 457. He noted that Plaintiff could continuously operate foot controls with his left foot, but could only occasionally operate foot controls with his right foot because of decreased strength in his right leg. *Id.* He indicated Plaintiff could never crawl or climb stairs, ramps, ladders, or scaffolds and could occasionally balance, stoop, kneel, and crouch. Tr. at 458. He based these restrictions on decreased strength and ROM in Plaintiff's right knee. *Id.* He stated Plaintiff could never be exposed to unprotected heights. Tr. at 459. He indicated Plaintiff could occasionally be exposed to moving, mechanical parts; dust, odors, fumes, and pulmonary irritants; extreme cold; extreme heat; and vibrations. *Id.* He claimed Plaintiff could frequently be exposed to operating a

motor vehicle and humidity and wetness. *Id.* He stated Plaintiff was "unable to perform persistent manual labor because of deficits in [r]ight [l]eg." *Id.* He indicated Plaintiff could perform activities like shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, two canes, or two crutches; walk a block at a reasonable pace on rough or uneven terrain; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle, or use paper or files. Tr. at 460. He stated the specified limitations were first present in June 2014 and had lasted or were expected to last for 12 consecutive months. *Id.*

### C.     The Administrative Proceedings

#### 1.     The Administrative Hearing

##### a.     Plaintiff's Testimony

At the hearing on July 31, 2015, Plaintiff testified that he lived with his parents. Tr. at 29. He indicated he was injured while working at Atlas Van Lines. Tr. at 34. He stated he had settled his workers' compensation claim. Tr. at 31. He indicated he worked as a residential mover for a few days at a time to support his children. Tr. at 45–46. He stated that his work exacerbated his pain and caused swelling. Tr. at 45.

Plaintiff testified that pain in his lower back and right knee prevented him from working. Tr. at 35. He indicated he had undergone three surgeries to his right knee, including one as a child. *Id.* He stated he had reduced strength in his right leg and walked with a limp.  Tr. at 37 and 44. He testified that his right knee often buckled. Tr. at 44. He indicated leg pain disturbed his sleep. Tr. at 40.

Plaintiff estimated that he could walk for 15 to 20 minutes at a time. Tr. at 39. He indicated that he would have to prop his leg on a pillow to rest it "for a second or two" if he stood for 15 to 30 minutes. *Id.* He testified that he felt uncomfortable after sitting for two to three minutes, but could sit for 15 to 20 minutes at a time. Tr. at 42. He indicated he occasionally used a crutch when he had to walk a significant distance and used a motorized cart in Walmart. Tr. at 37–38. He stated he had some difficulty climbing the stairs to his second floor bedroom. Tr. at 40. He indicated he felt uncomfortable when driving because he was unable to stretch his right leg and had difficulty operating the pedals. Tr. at 40–41.

He stated he took over-the counter medication three times a day, but was no longer taking prescribed medication. Tr. at 28 and 43. He admitted that he continued to smoke cigarettes, but denied using drugs or alcohol. Tr. at 35. He indicated he drove up to 20 miles three times a week. Tr. at 43. He stated he performed household chores that included sweeping, vacuuming, and taking out the trash. Tr. at 44. He indicated he was no longer able to play basketball. Tr. at 47.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Mary L. Cornelius reviewed the record and testified at the hearing. Tr. at 47–50. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited as Dr. Daniels described in his medical source statement. Tr. at 48. The ALJ asked whether there were any jobs in the regional or national economy that the hypothetical person would be able to perform. Tr. at 48–49. The VE identified jobs at the light exertional level with a specific vocational preparation

("SVP") of two and a sit/stand option as an information clerk, *Dictionary of Occupational Titles* ("*DOT*") number 239.367-018, with 33,000 positions in South Carolina and 1,200,000 positions in the national economy, and an office helper, *DOT* number 239.567-010, with 1,500 positions in South Carolina and 120,000 positions in the national economy.

The ALJ specifically questioned the VE about the sit/stand option. Tr. at 49. The VE confirmed that the *DOT* did not address a sit/stand option, but explained that she based her response on her professional experience and collaboration with other professionals. *Id.*

The ALJ asked if the VE if Dr. Daniels's medical source statement had addressed a need to elevate a leg. Tr. at 49. The VE stated it had not. Tr. at 50. The ALJ asked the VE to consider that the individual would need to elevate his leg at waist level at times in addition to break and lunch periods. *Id.* The VE indicated the accommodation would preclude competitive employment at any level. *Id.*

### 2. The ALJ's Findings

In his decision dated August 12, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since December 6, 2012, the application date (20 CFR 416.971 *et seq.*).
2. The claimant has the following severe impairments: recovering patellofemoral pain syndrome status post right knee anterior cruciate ligament reconstruction; chronic back pain; residual right weakness (20 CFR 416.920(c)).
3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift 20 pounds frequently and carry up to 50 pounds occasionally; sit 4 hours, stand 1 hour and walk 30 minutes without interruption; and sit 4 hours, stand 2 hours, and stand[5] 2 hours in an 8-hour workday. He does not require a cane for ambulation. He does not have any limitations in reaching, pushing, pulling, handling, fingering, or feeling. He can operate foot controls occasionally with the right foot but continuously with the left foot. He cannot climb or crawl or work at unprotected heights. He can occasionally balance, stoop, kneel, and crouch. He can occasionally work around moving mechanical parts, dust, fumes, odors, pulmonary irritants, extreme heat or cold, and vibration. He can frequently operate a motor vehicle and work around humidity and wetness. He can work around no more than moderate noise.

5. The claimant does not have vocationally relevant past work (20 CFR 416.965).

6. The claimant was born on June 15, 1983, and was 29 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.964).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 6, 2012, the date the application was filed (20 CFR 416.920(g)).

Tr. at 13–20.

---

[5] This appears to be a scrivener's error that should read "walk," instead of "stand" based on the ALJ's reliance on opinions from Drs. Noojin and Daniels. *See* Tr. at 19 ("The above residual functional capacity set forth in Finding 4 above is supported by the findings and opinion of consultative examiner, Dr. Daniels. It is further supported by the opinion of treating orthopedist, Dr. Noojin."); *see also* Tr. at 399 (releasing Plaintiff with limitations as indicated in the FCE), Tr. at 410 (limiting Plaintiff to light duty work based on the results of the FCE), and Tr. at 456 (indicating Plaintiff could sit for four hours, stand for two hours, and walk for two hours in an eight-hour workday).

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ's finding that Plaintiff was able to ambulate effectively was not supported by the evidence;

2)      the ALJ erroneously concluded that Plaintiff's statements were not supported by the record; and

3)      the ALJ did not consider all of the VE's testimony.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Ability to Ambulate Effectively

Plaintiff argues the ALJ did not consider all of the medical evidence in determining that he was able to ambulate effectively. [ECF No. 13 at 2]. He maintains that the ALJ did not adequately consider evidence of atrophy and decreased ROM in his right leg. *Id.* at 2–3. He contends that Drs. Daniels's and Noojin's observations and opinions supported a finding that he could not ambulate effectively. *Id.* at 3.

The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff was able to ambulate effectively and, thus, did not meet Listing 1.03. [ECF No. 14 at 11–12]. She maintains that the ALJ cited specific evidence that showed Plaintiff was able to ambulate effectively and that the record as a whole supported his conclusion. *Id.* at 12–13. She contends that neither evidence of muscle atrophy nor

opinions from Drs. Noojin and Daniels suggest Plaintiff was unable to ambulate effectively. *Id.* at 13–14.

Plaintiff calls the court's attention to Listing 1.03. [ECF No. 13 at 2]. Listing 1.03 directs a finding that an individual is disabled if he has undergone reconstructive surgery or surgical arthrodesis of a major weight-bearing joint; is unable to ambulate effectively, as defined in Listing 1.00B2b; and a return to effective ambulation has not occurred or is not expected to occur within 12 months of the onset. 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, §1.03.

The following definition of "inability to ambulate effectively" is provided in § 1.00B2b:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.).

20 C.F.R., Pt. 404, Subpt. P, App'x. 1, §1.00B2b(1). The regulation further states:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home

without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App'x. 1, §1.00B2b(2).

The ALJ found that the evidence did not establish that Plaintiff was unable to ambulate effectively. Tr. at 13. He indicated no treating or examining physician had "mentioned findings equivalent in severity to the criteria of any listed impairment." *Id.* He found that Plaintiff did not require a cane to ambulate. *Id.*

Although Plaintiff cites evidence of atrophy and decreased ROM in his right leg; an inability to squat; limited abilities to engage in prolonged standing, walking, climbing, and squatting; and a need to occasionally wear a brace [ECF No. 13 at 2–3], these findings do not constitute an inability to ambulate effectively. *See* 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, §1.00B2b(2).

The ALJ cited substantial evidence to support his findings that Plaintiff did not require an assistive device to ambulate and was capable of engaging in functions consistent with effective ambulation. He noted that following the July 2010 surgery, Plaintiff "was weaned off the crutches as of August 10, 2010"; was authorized to return to work at light duty on October 14, 2010; and was authorized to return to work without restriction on December 17, 2010. Tr. at 15. He acknowledged that Plaintiff's gait was "a little guarded" in July 2012, but that Dr. Noojin subsequently authorized him to return to work with no prolonged standing and no kneeling, squatting, climbing, or work at heights. *Id.* He stated Dr. Lehman had observed Plaintiff to have "a definite antalgic limp." Tr. at 16. However, he indicated Dr. Motycka had subsequently observed Plaintiff to have a normal orthopedic examination; to be able to tandem walk, heel walk, and toe

walk without difficulty; to be able to squat and raise without difficulty; to have no gait disturbance; and to not require an assistive device to ambulate. *Id.* He stated Dr. Daniels had observed Plaintiff to have decreased ROM and atrophy in his right leg; 3/5 strength; an inability to squat; decreased sensation to pinprick and light touch in his lower right leg; and to be unsteady with tandem walk, heel walk, and toe walk. Tr. at 17. Nevertheless, he noted that Dr. Daniels had indicated Plaintiff did not require a cane for ambulation; was capable of standing for one hour and walking for 30 minutes without interruption; and maintained abilities to walk without an assistive device, travel without assistance, and walk a block at a reasonable pace on rough or uneven terrain. Tr. at 17–18.

In light of the foregoing, the undersigned finds no error in the ALJ's assessment of Plaintiff's ability to ambulate.

2.      Alleged Inconsistencies Between Plaintiff's Allegations and the Record

Plaintiff argues that all of his treating physicians, and all, but one, of the consultative physicians determined he had significant limitations to his right leg. [ECF No. 13 at 3–4]. He maintains the ALJ should not have discounted his credibility based on missed physical therapy visits in 2010. *Id.* at 4.

The Commissioner argues the ALJ carefully considered Plaintiff's testimony and explained his reasons for concluding that Plaintiff's statements were not entirely supported by the record. [ECF No. 13 at 15]. She maintains that the ALJ thoroughly explained that Plaintiff's allegations were inconsistent with evidence of unremarkable examinations during the relevant period; his need for only over-the-counter pain

medication; the absence of evidence that he regularly sought emergency room treatment; his noncompliance with physical therapy after his first surgery; and his activities of daily living ("ADLs"). *Id.* at 15–17. She contends that Plaintiff sought no medical treatment between 2012 and August 2015, except for an isolated visit to the ER for a bump to his head in December 2013. *Id.* at 15.

After finding that a claimant has a medically-determinable impairment that could reasonably be expected to produce the symptoms he alleges, the ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the restrictions they impose on the claimant's ability to do basic work activities. SSR 96-7p. If the objective medical evidence does not validate the claimant's statements about the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider the credibility of the statements in light of the entire case record. *Id.* The ALJ should evaluate "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.*

The ALJ should also consider the following factors in evaluating a claimant's subjective statements: the claimant's ADLs; the location, duration, frequency, and intensity of the pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of the medications; treatment, other than medication, he receives or has received; any measures other than treatment and medications he uses or has used to relieve the pain or other symptoms; and any other

relevant factors concerning his limitations and restrictions. *Id.* In *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015), the court emphasized the need to compare the claimant's alleged functional limitations to the other evidence of record and indicated an ALJ should explain how he decided which of a claimant's statements to believe and which to discredit.

The ALJ must cite specific reasons to support his credibility finding and his reasons must be consistent with the evidence in the case record. SSR 96-7p. His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.* An ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that his statements concerning their intensity, persistence, and limiting effects "were not credible to the extent alleged." Tr. at 18.

The ALJ's decision reflects his thorough consideration of Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his symptoms in light of the entire record. SSR 96-7p. He specifically considered the location, duration, frequency, and intensity of Plaintiff's pain. *See* Tr. at 14 (recognizing Plaintiff's claims that he experienced swelling, stiffness, cramps, instability, and pain in his back and right knee and leg and that his right leg was weak, buckled daily, and caused him to experience back pain and to walk with a limp). He acknowledged the factors that allegedly precipitated

and aggravated Plaintiff's symptoms. *See id.* (noting that Plaintiff testified that his leg buckled if he attempted to run or jump). He considered Plaintiff's medications and their effects. *See id.* (citing Plaintiff's testimony that he used over-the-counter medication three times a day for pain) and Tr. at 17 (acknowledging that Plaintiff reported taking Motrin and Tylenol in March 2013; Motrin, Tylenol, and Oxycodone in July 2013; Motrin and Tylenol in September 2013; and Hydrocodone-Acetaminophen in July 2014). He noted methods other than medication that Plaintiff used to reduce his pain. *See id.* (recognizing Plaintiff's testimony that he occasionally needed a crutch to walk long distances and used a motorized cart in Walmart; that he would have to elevate his leg after walking for 15–20 minutes; and that he attempted home exercises to address his pain). He considered Plaintiff's ADLs. *See* Tr. at 14 (noting Plaintiff's claims of difficulty showering, dressing, and putting on shoes and his abilities to drive 20 miles three times a week, vacuum, sweep, and take out the trash) and Tr. at 17 (stating Plaintiff had informed Dr. Motycka that he continued to work for Atlas Van Lines). Thus, the ALJ considered the relevant factors in evaluating Plaintiff's credibility. *See* SSR 96-7p.

The ALJ's decision shows that he considered the objective medical evidence, Plaintiff's statements, and the opinion evidence from the treating and consultative physicians in evaluating Plaintiff's credibility. He found that Plaintiff's "limited use of pain medication, failure to even fill prescriptions prescribed for only mild to moderate pain, discontinuance of physical therapy sessions, failure to sustain any consistent medical regimen for treatment, lack of hospitalizations or emergency room visits, or other significant treatment for pain constitute specific evidence which supports an acceptable

credibility determination that pain and other symptoms are not disabling." *Id.* Thus, the ALJ did not credit Plaintiff's statements that were inconsistent with a majority of the evidence that showed he was not entirely disabled.

However, contrary to Plaintiff's allegation, the ALJ considered evidence of significant limitation to Plaintiff's right leg and included restrictions in the RFC assessment that addressed the impairment. He limited Plaintiff to standing for one hour at a time and for a total of two hours in an eight-hour workday; walking for 30 minutes at a time and for a total of two hours in an eight hour workday; operating foot controls with the right foot on an occasional basis; no climbing, crawling, or work at unprotected heights; occasional balancing, stooping, kneeling, and crouching; and only occasional exposure to moving mechanical parts and vibration. *See* Tr. at 13–14.

The court rejects Plaintiff's argument that the ALJ erred in considering his failure to attend physical therapy visits following his first surgery. Pursuant to SSR 96-7p, a claimant's statements may be deemed less credible if "the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." Although the law prohibits ALJs from penalizing claimants for "failing to seek treatment they cannot afford," *Lovejoy v. Heckler*, 790 F.2d 1114, 117 (4th Cir. 1986), the record does not indicate Plaintiff was unable to afford physical therapy. Instead, it suggests that Plaintiff's physical therapy was covered under workers' compensation. *See* Tr. at 31. Plaintiff has provided no "good reasons" for his failure to attend the physical therapy visits prescribed after his first surgery. Furthermore, the record shows that Plaintiff was warned that a failure to follow the prescribed physical

therapy could be detrimental to his recovery. *See* Tr. at 333. In light of the foregoing, the ALJ did not err in considering Plaintiff's failure to attend physical therapy as one of several factors that reduced the credibility of his statements.

The ALJ complied with the provisions of SSR 96-7p, and substantial evidence supports his credibility assessment. The ALJ found that Plaintiff's testimony and evidence regarding his condition, activities, and capabilities suggested that his impairments imposed some limitations, but were not severe enough to preclude all work-related activities. Tr. at 18–19. He noted the relevant objective findings and indicated he assessed an RFC that was consistent with the findings and opinions of Drs. Daniels and Noojin. *See id.* Therefore, the ALJ credited Plaintiff's allegations to the extent that they were consistent with the objective findings of record and the opinions of Drs. Daniels and Noojin. He cited sufficient evidence to support his conclusion, and the court's review of the record as a whole supports his decision.

### 3. Reliance on VE's Testimony

Plaintiff argues that the *DOT* does not address the sit/stand option the ALJ included in the RFC assessment. [ECF No. 13 at 4]. He further maintains that the ALJ erred in failing to consider the VE's testimony that he would be precluded from performing all work if he were required to elevate his right leg on a frequent basis. *Id.*

The Commissioner claims that the ALJ correctly concluded that the evidence did not establish a need for Plaintiff to elevate his leg on a frequent basis. [ECF No. 14 at 17–18]. She contends that the ALJ was not required to consider VE testimony with respect to a limitation that was not credibly-established. *Id.* at 18. She maintains the ALJ recognized

that the *DOT* did not address a sit/stand opinion and relied on the VE's testimony to find that jobs would accommodate the restriction. *Id.* at 18.

To support a finding that a claimant is "not disabled," the ALJ must either find that the claimant's RFC allows him to perform his PRW or that he can make an adjustment to other work. *See* 20 C.F.R. § 416.920(a)(4)(iv), (v). The ALJ may obtain testimony from a VE to meet the Commissioner's burden to produce specific vocational evidence showing that the national economy provides employment opportunities for the claimant. *See Walker*, 889 F.2d at 50; *see also Aistrop*, 36 F. App'x at 147 (providing that where a claimant has both exertional and nonexertional impairments that prevent performance of a full range of work at a given exertional level, "the Commissioner must prove through expert vocational testimony that jobs exist in the national economy which the claimant can perform"). The VE's opinion "must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of [a] claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). The ALJ cannot rely on the jobs the VE cites if he fails to include all of the claimant's credibly-established limitations in the hypothetical question to the VE. *See id.*

Although the VE testified that no competitive work would be available if an individual were required to elevate his leg at waist-level, the ALJ pointed out during the hearing that Dr. Daniels had not suggested that Plaintiff would be required to elevate his leg during the workday. *See* Tr. at 49–50. Furthermore, the ALJ did not include a

provision for elevation of the right leg in the RFC assessment. *See* Tr. at 13–14. Plaintiff's alleged need to elevate his leg was among the subjective allegations that the ALJ rejected. *See* Tr. at 14 (noting Plaintiff's testimony that he needed to elevate his leg after walking for 15 to 20 minutes) and Tr. at 19 (indicating that the evidence failed to establish that Plaintiff's impairments were severe enough to preclude performance of all work-related activities). Plaintiff has cited no evidence to support a need to elevate his right leg [ECF No. 13 at 5], and the undersigned's review of the record reveals no medical opinions or other evidence, aside from Plaintiff's testimony, that supports such a restriction. Therefore, the ALJ was not required to consider the VE's testimony that a need to elevate the right leg during the workday would preclude employment because the restriction was not credibly established in the record.

To the extent Plaintiff argues the ALJ's reliance on the VE's identification of jobs with a sit/stand option was misplaced because the *DOT* fails to address the sit/stand option, the court rejects this argument. If the VE's testimony appears to conflict with job descriptions in the *DOT*, the ALJ is required to "'[i]dentify and obtain a reasonable explanation' for conflicts between the vocational expert's testimony and the *Dictionary*, and to '[e]xplain in the determination or decision how any conflict that has been identified was resolved.'" *Pearson v. Colvin*, 810 F.3d 204, 208 (4th Cir. 2015), citing SSR 00-4p. In *Pearson*, the court explained that an apparent conflict exists when the VE's testimony "seems to, but does not necessarily, conflict with the *Dictionary*." *Id.* at 209. During the hearing, the ALJ confirmed that the *DOT* did not address the sit/stand option and obtained an explanation from the VE as to the information she relied on to

reach her conclusion. *See* Tr. at 49. He cited the jobs the VE indicated in her testimony and explained his resolution of the apparent conflict as follows:

> While the <u>Dictionary of Occupational Titles</u> does not address whether a job permits a sit/stand option, the testimony of the vocational expert, which is based on his/her knowledge and personal observations, expands the descriptions provided in the <u>Dictionary of Occupational Titles</u>. I find that the testimony is not inconsistent with the <u>Dictionary of Occupational Titles</u>.

Tr. at 20.

The ALJ followed the court's precise direction in *Pearson* by identifying the apparent conflict between the VE's testimony and the *DOT*'s job descriptions; obtaining an explanation for the basis of the VE's testimony during the hearing; and explaining in the decision how he resolved the apparent conflict. *See Pearson*, 810 F.3d at 208. Thus, substantial evidence supports the ALJ's reliance on the jobs the VE identified to meet the Commissioner's burden at step five.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

*Shiva V. Hodges*

August 11, 2017                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge